# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | | |
|---|---|---|
| REGINALD MORGAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:05CV01433MLM |
| | ) | |
| JO ANNE B. BARNHART, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

This is an action under Title 42 U.S.C. § 405(g) for judicial review of the final decision of Jo

Anne B. Barnhart ("Defendant") denying the application of Plaintiff Reginald Morgan ("Plaintiff")

for Disability Insurance Benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 et. seq.,

and for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C.

§§ 1381 et. seq. ("the Act"). Plaintiff has filed a brief in support of his Complaint. Doc. 14.

Defendant has filed a brief in support of the Answer. Doc. 15. The parties have consented to the

jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b). Doc.

7.

## I.
## PROCEDURAL HISTORY

On May 30, 2003, Plaintiff filed an application for disability insurance benefits and SSI

alleging a disability onset date of March 17, 2003, based on shortness of breath, fatigue, sleep apnea,

generalized body pain, a heart condition, and status post gunshot wound to both lower extremities.

(Tr. 62-64). Plaintiff's application was denied. (Tr. 44-48). Plaintiff then requested a hearing which

was held before Administrative Law Judge ("ALJ") Myron D. Mills on December 15, 2004. (Tr. 43,

239-54). In a decision dated January 15, 2005, the ALJ found that Plaintiff is not disabled under the

meaning of the Act, through the date of the decision and, therefore, is not entitled to disability insurance benefits or SSI. (Tr. 16-23).

On July 20, 2005, the Appeals Council denied Plaintiff's request for review of the ALJ's decision. (Tr. 3-5). The decision of the ALJ thus stands as the final decision of the Commissioner.

## II.
## TESTIMONY BEFORE THE ALJ

### A. Plaintiff's Testimony:

Plaintiff testified that, at the time of the hearing, he was thirty-seven years old; that he lived with his fiancee; that he was 5'6" tall; that he weighed about 300 pounds; and that his weight had increased from 250 to 300 pounds because he could not move around when he became sick. (Tr. 242-43). Plaintiff further testified that he used to work as a "crew trainer and fast food and maintenance manager"; that he worked until March 17, 2003; and that he stopped working because he started "bloating up" and had heart failure. (Tr. 243).

Plaintiff testified that he has been hospitalized for his heart condition; that he had not been hospitalized in 2004; and that during 2004 he went to the doctor "twice, three times, four times." Plaintiff's attorney interjected that Plaintiff did not have a regular cardiologist and that Plaintiff was under the care of Dr. Michael Bross at Pine Lawn Clinic who was treating him for all of his health problems. Plaintiff's attorney also told the ALJ that Plaintiff underwent a sleep study in May of 2003, the results of which showed that Plaintiff has severe sleep apnea; that Plaintiff has a full scale IQ of 76; and that Plaintiff has a hearing loss on his left side. (Tr. 243-45).

Plaintiff testified that he had not driven his car for two or three months prior to the hearing; that he stopped driving because he kept falling asleep while he was behind the wheel; that he does not do housework, cook, or grocery shop; and that his fiancee grocery shops, cooks, and does housework for him. Plaintiff also testified that he does not play sports; that he can take care of his personal needs

if he is sitting down; that he is unable to take showers; that he can take baths with assistance getting into and out of the bathtub; that he does crossword puzzles and listens to the radio; and that he goes to church on Sundays. (Tr. 246-249).

Plaintiff stated that he had been on oxygen for two years; that he was originally prescribed oxygen by Dr. Braw at Barnes Jewish Hospital; and that he believed his oxygen level is set at 87. (Tr. 247-248). Plaintiff further stated that he can stand for 20 to 30 minutes before having to sit down; that he can sit, uninterrupted, for about one hour; that he can lift 10 pounds; that his back and thighs hurt when he walks; and that he has difficulty walking because he suffers from back and thigh muscle spasms and bullet wounds in his legs. (Tr. 248-49).

## B. Testimony of Shallanda Miller

Ms. Miller testified that she has known Plaintiff for four and a half years; that she is engaged to him; and that she and Plaintiff plan to be married during 2005. (Tr. 250).

Ms. Miller testified that when she first starting dating Plaintiff he was fairly active. When asked by the ALJ when Plaintiff's inactivity began, Ms. Miller was unable to specify when Plaintiff started becoming inactive and said that she believed it to be "about 2000--it was around up in the 2000s." (Tr. 250). Ms. Miller said that she performed all the housework, cooking, and grocery shopping for Plaintiff because he was unable to do so himself. (Tr. 250). Ms. Miller testified that Plaintiff goes to the doctor every six months; that he takes his portable oxygen supply everywhere that he goes; that he has a large oxygen concentrator at home; and that she believes he might have to take his oxygen tank to the alter when she and Plaintiff get married. (Tr. 251).

Ms. Miller also testified that she has three children of her own; that she has not been married before; that she receives $292 in welfare and $564 in Social Security disability benefits per month; and that she supports her family and pays rent from this income. (Tr. 253). Ms. Miller stated that

she receives Social Security disability benefits because she suffers from a depression disorder and schizophrenia.  (Tr. 253).

## III.
## MEDICAL RECORDS

A Psycho-Educational Reassessment dated September 25, 1986, prepared by Sanceria Thomas, a school psychologist for St. Louis Public Schools, states that a WAIS-R IQ test showed Plaintiff's verbal IQ was 78 and that he had a full scale IQ of 76.  This report also states that Plaintiff was an extremely slow worker; that his attention was satisfactory; that he was obese; and that according to St. Louis Public School's criteria, Plaintiff was learning disabled. (Tr. 74).

Medical records of the Pine Lawn County Health Center in Pine Lawn, Missouri, reflect that the Plaintiff had a physical examination on March 14, 2003.  Records state that Plaintiff was a new patient; that he had difficulty focusing his eyes and seeing; that his throat, neck, and extremities were abnormal; that Plaintiff complained of sleep apnea and seizures; that the assessment was that Plaintiff had sleep apnea and seizures; that a Comprehensive Metabolic Panel test was ordered; and that Plaintiff was referred for further treatment with social services and nutrition. (Tr. 186-87).

Medical records of March 18, 2003 from the Pine Lawn County Health Center reflect that Plaintiff met with a social services counselor on this date.  The counselor's notes state that Plaintiff had been drinking since he was eight years old; that he had been smoking marijuana since he was ten years old; that he currently was drinking between two and three pints of cognac and Hennessy a day; that he smoked daily an amount of marijuana equivalent to the amount of tobacco in one pack of cigarettes; and that Plaintiff expressed that he was interested in stopping his drug and alcohol use. Further, the counselor reported that Plaintiff repeatedly fell asleep during the interview which made assessment of Plaintiff difficult.  (Tr. 185).

Medical records from the Pine Lawn County Health Center dated March 26, 2003, reflect that Plaintiff was transferred from Pine Lawn County Health Center to the Emergency Room at Barnes Jewish Hospital ("BJC"). (Tr. 184).

An Initial Note from BJC dated March 26, 2003, states that Plaintiff's chief complaint upon being admitted to BJC was lower extremity swelling. Notes of this date further state that Plaintiff's sleep apnea "presents for onset CHF"; that Plaintiff had been experiencing increased weight gain and increased waist size; and that since January 2003 Plaintiff had noticed lower extremity swelling that would go away at night and reaccumulate throughout the day. (Tr. 226-30).

Notes from BJC dated March 27, 2003, state that Plaintiff suffered from alcohol abuse and hypertension, and was suspected of having right-sided congestive heart failure and obstructive sleep apnea. (Tr. 225). A cardiac sonogram performed on this date showed normal diastolic function, normal left and right ventricle size, and systolic function. The test also showed mild mitrial regurgitation. (Tr. 221-24).

Teaching Physician Notes from Dr. Peterson of BJC, which notes are dated March 27, 2003, state that Plaintiff had shortness of breath, lower extremity edema, and alcohol and marijuana use. Notes state that Plaintiff should undergo a sleep study to explore the possibility that sleep apnea was contributing to Plaintiff's lower extremity swelling. (Tr. 223-23A).

Dr. Peterson's notes of March 28, 2003 state that Plaintiff was feeling better; that he had difficulty sleeping with two liters of Oxygen; that Plaintiff was somnolent during the interview and fell asleep while being interviewed; and that the assessment was that Plaintiff had shortness of breath likely caused by sleep apnea, that Plaintiff was obese, and that Plaintiff suffered from metabolic syndrome and sleep apnea. (Tr. 220).

Records of BJC reflect that Plaintiff was admitted on May 22, 2003, complaining of bilateral lower extremity swelling and shortness of breath for three to four weeks. Records of this date state that when admitted, Plaintiff endorsed daytime fatigue as well as morning headache. (Tr. 198-200).

A Discharge Summary of May 27, 2003 states that results from Plaintiff's cardiac echocardiogram and trans-thoracic Doppler showed left ventricular hypertrophy and small to moderate pericardial effusion and that a ventilation perfusion scan showed low probability for pulmonary embolism. It was noted in the Discharge Summary that Plaintiff's medical history included morbid obesity and hypertension; that he had no insurance and, therefore, was not able to afford his medications; and that Plaintiff was working for a home health agency at the time of admittance to the hospital. The Discharge Summary further states that Plaintiff's bilateral lower extremity edema and abdominal wall edema were thought to be secondary to progressive right heart failure which was secondary to obstructive sleep apnea; that upon discharge, Plaintiff had no residual edema and all Plaintiff's heart failure symptoms were controlled; that in regard to Plaintiff's right heart failure, the likely cause was thought to be pulmonary hypertension from obstructive sleep apnea; that Plaintiff agreed to fully comply with his medication regimen and low-fat, low-salt, low-cholesterol diet; and that Plaintiff was warned of the consequences of continued alcohol abuse and was advised to walk daily. (Tr. 192-96).

John S. Burr, M.D., of the Washington University Sleep Disorders Laboratory, reported that Plaintiff had an all-night polysomnography on May 28, 2003, which demonstrated that Plaintiff had very severe obstructive sleep apnea; that sleep apnea of this degree produces significant excessive daytime sleepiness and may have other adverse health consequences; and that titration of nasal CPAP and BIPAP documented that both are an effective treatment for Plaintiff's sleep apnea; and that at

the best CPAPA pressure there were only an insignificant number of abnormal breathing events and consolidated sleep appeared. (Tr. 190).

Records from the Pine Lawn County Health Center reflect that Plaintiff was seen on June 3, 2003, for a regular check-up and a re-fill on his medications. Notes from this check-up reflect that Plaintiff was referred to the Emergency Room at Forest Park Hospital after he complained of pain in his right calf and cramping for four to five days; that Plaintiff was on oxygen at the time of the check-up; that Plaintiff reported being on oxygen since March 2003; and that Plaintiff denied any shortness of breath during the check-up. (Tr. 183). Notes from Plaintiff's June 3, 2003 Pine Lawn County Health Center visit also reflect an assessment of Plaintiff as having suspected deep vein thrombosis on his right side, sleep apnea, and increased blood pressure with a history of seizures. (Tr. 182).[1]

Records of Forest Park Hospital reflect that Plaintiff seen in the emergency room on June 3, 2003, complaining of right leg pain and swelling; that Plaintiff reported using home oxygen; that a venous scan showed no evidence of deep venous thrombosis of Plaintiff's right leg; and that Plaintiff was given crutches and trained on how to use them. Records further state that upon discharge Plaintiff was instructed to rest, apply moist heat to his leg, to use his crutches, and to ask his primary physician if Lovastatin was causing the pain. (Tr. 168-74).

Plaintiff's medical records reflect that Plaintiff had a consultative examination with Zahirul Haque, M.D., at the Forest Park Medical Clinic, Inc., on August 1, 2003. Dr. Haque noted that he reviewed Plaintiff's hospital records from 2003 prior to Plaintiff's exam. Dr. Haque's report from

---

[1]  Citing page 182 of the transcript, Plaintiff states in his Brief in Support of Complaint that medical records indicate that he was seen at Pine Lawn Clinic on June 14, 2003. The court notes that pages 182-183 of the transcript include medical records reflecting that Plaintiff was seen on June 3, 2003, not June 14, 2003, at Pine Lawn Community Health Center.

this examination states that Plaintiff had a history of congestive heart failure and shortness of breath and that physical examination of Plaintiff revealed that Plaintiff weighed 205 pounds, was 65.5 inches tall, had a blood pressure of 132/72 and had a resting heart rate of 78 beats per minute. The doctor further noted that Plaintiff appeared obese and did not appear to be in any acute distress; that Plaintiff's speech, hearing, and conversation were normal; and that Plaintiff used oxygen while in the examination room. Pursuant to examination Dr. Haque reported that Plaintiff had bilateral normal air entry in his lungs; that Plaintiff had no wheezing or crepitations; Plaintiff was normal in auscultation and percussion in bilateral lung fields; that Plaintiff had slow gait and station, normal toe and heel walking; that he could get on and off the examination table; that he had difficulties doing so because of his obesity; that Plaintiff had no joint deformity or swelling or muscle atrophy; that in regard to Plaintiff's heart, there was "normal S1 and S2" and he could not "appreciate any S3, S4 or murmur"; and that Plaintiff was alert and oriented. Dr. Haque stated that his impression was that, by history, Plaintiff had congestive heart failure and that during the examination Plaintiff's congestive heart failure was "mostly unremarkable." Dr. Haque's clinical impression also included that Plaintiff had sleep apnea by history and obesity and he used oxygen and CPAP machine at home and that Plaintiff's examination was unremarkable. (Tr. 161-63).

Terry L. Dunn, Ph.D., completed a Psychiatric Review Technique Form on October 9, 2003, based on Plaintiff's records. This Psychiatric Review Technique Form states that Plaintiff had no medically determinable impairments; that Plaintiff's WAIS-R IQ test results from a test administered on September 25, 1986, were reviewed; that Plaintiff had been diagnosed as learning disabled in reading, spelling, and arithmetic; and that there was insufficient evidence of functional limitations. (Tr. 104).

Progress Notes dated December 4, 2003, reflect that Plaintiff was seen by Dr. Bross at the Pine Lawn County Health Center. (Tr. 160). Dr. Bross reported that Plaintiff complained of gastro-intestinal distress. Dr. Bross's notes of December 4, 2003 are otherwise not legible. (Tr. 160).

Progress Notes from Pine Lawn County Health Center reflect that Plaintiff was seen on January 28, 2004, for a follow-up and that Plaintiff complained of pains in his legs due to gunshot wounds, sleep apnea, and poor hearing in his right ear. Notes of this date state that Plaintiff suffered a gunshot wound in 1995; that Plaintiff's pain from this wound had been very bad for the past three years; that at times Plaintiff could barely stand; that cold weather aggravated Plaintiff's pain in his legs; and that the pain in Plaintiff's legs was getting progressively worse. Notes further reflect that Plaintiff reported that rest improved his leg pain as did working out the "charlie-horse" like knots in his legs; that he worked at Popeye's in 2000, a job which required him to be on his feet and strained his legs; that he was unemployed at the time of the visit; and that potential employers were unwilling to hire him due to his health. Notes also state that Plaintiff was on CPAP at night due to his obstructive sleep apnea and that Plaintiff weighed 295 pounds at the time of the visit in contrast to Plaintiff's weight of 240 pounds in 2000. (Tr. 158-59).

Progress Notes dated March 1, 2004, reflect that Plaintiff was seen at the ENT clinic at Saint Louis ConnectCare; that Plaintiff complained that he had complete hearing loss on his right side for two years; and that an audio test was scheduled at Barnes Jewish Hospital. (Tr. 153-54).

Records of Washington University School of Medicine Department of Otolaryngology reflect that Plaintiff's hearing was evaluated on March 3, 2004 by audiologist Laura Flowers. The audiologist's report states that her assessment was that Plaintiff had moderate severe to moderate to profound hearing loss on his right side and "normal to mild to normal hearing" on his left side; that Plaintiff had moderate loss of speech recognition on his right side and normal speech recognition on

his left side; that he had very poor word recognition on his right side and normal word recognition on his left side; and that Plaintiff's word recognition was 48% on the right and 92% on the left. (Tr. 155-56).

Records of the ENT Clinic at Saint Louis ConnectCare reflect that Plaintiff was seen on March 31, 2004 for a follow-up visit. Progress Notes of this date state that Plaintiff met with the ENT attending physician and that Plaintiff had marked asymmetric sensoneural hearing loss.[2] (Tr. 152).

## IV.
## DECISION OF THE ALJ

After considering the evidence of record, the ALJ concluded that Plaintiff was not under a "disability," as that term is defined in the Social Security Act, at any time through the date of the decision. (Tr. 22). The ALJ found that Plaintiff had not engaged in substantial gainful activity at any time relevant to his determination. (Tr. 22).

The ALJ assessed the medical records and set forth Plaintiff's medical history. (Tr. 17-20). He determined that the medical evidence established that Plaintiff has congestive heart failure, by history, and sleep apnea. However, Plaintiff did not have an impairment or combination of impairments that met or equaled any criteria contained in the Listing of Impairments, Appendix 1, Subpart P, Regulations No. 4. (Tr. 20).

The ALJ then assessed Plaintiff's residual functional capacity ("RFC"). The ALJ concluded that Plaintiff has the RFC to lift and carry ten pounds, both occasionally and frequently; to sit with usual breaks for about two hours in an 8-hour workday; and is unlimited in his ability to push and

---

[2]      In his Brief in Support of Complaint Plaintiff incorrectly references records from March 3, 2004, as those from March 31, 2004.

pull. (Tr. 21). The ALJ found that Plaintiff's RFC coincides with the exertional capacity to perform the full range of sedentary exertional work. (Tr. 21).

In reaching this conclusion, the ALJ found Plaintiff's subjective complaints not to be fully credible. The ALJ found that the following factors detracted from Plaintiff's credibility: (1) the unremarkable findings of the objective consultative exam conducted in August, 2003; (2) the results of the May 2003 all-night polysomography which found administration of nasal CPAP and BiPAP to be effective forms of treatment for Plaintiff's claimed impairment of obstructive sleep apnea; (3) Plaintiff's failure to participate in any conservative treatment program such as chiropractic care, physical therapy, or massage; and (4) Plaintiff's poor earnings record which undermined his credibility with regard to his allegations of disabling symptoms and his overall motivation to work. (Tr. 20-21). For these reasons combined, the ALJ concluded that the record as a whole does not support a finding that Plaintiff's impairments are as limiting as he alleges. (Tr. 21).

In light of Plaintiff's RFC, the ALJ found that Plaintiff was precluded from performing his past relevant work.[3] (Tr. 22). The ALJ found that Plaintiff was a "younger individual," with a high school

---

[3]     The court notes that in his determination, the ALJ states on page 21 of the transcript, "the Administrative Law Judge finds that the claimant, in view of the residual functional capacity determined, would have been able to perform the job requirements of any [of] his past relevant work." However, the ALJ then proceeded on to shift the burden to the Commissioner to show other jobs existing in significant numbers in the national economy which Plaintiff could perform with his medical impairments. By shifting the burden to the Commissioner, the ALJ was completing step five of the framework for determining whether an individual is disabled. The ALJ's analysis is consistent with a finding that Plaintiff's medically determinable impairment does, in fact, preclude him from performing his past relevant work. Further, the ALJ, in his itemized list of findings on page 22, concludes that "the claimant's past relevant work required the performance of work-related activities precluded by the above limitations (20 CFR 404.1565)." As such, the court regards the ALJ's statement on page 21 of the transcript, that "the Administrative Law Judge finds that the claimant, in view of the residual functional capacity determined, would have been able to perform the job requirements of any [of] his past relevant work," as a typographical error. The court finds, therefore, that the ALJ intended to say on page 21 that Plaintiff's RFC prevents him from performing his past relevant work.

education, having completed twelfth grade. Based on Plaintiff's vocational profile, age, education, work experience, and residual functional capacity, the ALJ determined that Plaintiff would be able to make a vocational adjustment to work which exists in significant numbers in the national economy. (Tr. 21-22). Accordingly, the ALJ concluded that Plaintiff is not under a "disability," as defined by the Act.

**V.**

**LEGAL STANDARD**

Under the Social Security Act, the Commissioner has established a five-step process for determining whether a person is disabled. 20 C.F.R. § § 416.920, 404.1529. In this sequential analysis, the claimant first cannot be engaged in "substantial gainful activity" to qualify for disability benefits. 20 C.F.R. § § 416.920(b), 404.1520(b). Second, the claimant must have a severe impairment. 20 C.F.R. § § 416.920(c), 404.1520(c). The Social Security Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities …" Id. Third, the ALJ must determine whether the claimant has an impairment which meets or equals one of the impairments listed in the regulations. 20 C.F.R. § § 416.920(d), 404.1520(d); Part 404, Subpart P, Appendix 1. If the claimant has one of, or the medical equivalent of, these impairments, then the claimant is per se disabled without consideration of the claimant's age, education, or work history. Id. Fourth, the impairment must prevent claimant from doing past relevant work. 20 C.F.R. § § 416.920(e), 404.1520(e). The burden rests with the claimant at this fourth step to establish his or her RFC. Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004); Young v. Afpel, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000). The ALJ will "review [claimants]' residual functional capacity and the physical and mental demands of the work [claimant] [has] done in the past." Id.

Fifth, the severe impairment must prevent claimant from doing any other work. 20 C.F.R. §§ 416.920(f), 404.1520(f). At this fifth step of the sequential analysis, the Commissioner has the burden of production to produce evidence of other jobs in the national economy that can be performed by a person's with the claimant's RFC. Young, 221 F.3d at 1069 n.5. If the claimant meets these standards, the ALJ will find the claimant to be disabled. "The ultimate burden of persuasion to prove disability, however, remains with the claimant." Id. See also Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004) ("The burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five."); Charles v. Barnhart, 375 F.3d 777, 782 n.5 (8th Cir. 2004) (holding that at Step 5, the burden of production shifts to the Commissioner, although the Commissioner is to required to reestablish the RFC which the claimant must prove at Step 4). "If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled." Eichelberger, 390 F.3d at 590-91.

Even if a court finds that there is a preponderance of the evidence against the ALJ's decision, that decision must be affirmed if it is supported by substantial evidence. Clark v. Heckler, 733 F.2d 65, 68 (8th Cir. 1984). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002). In Bland v. Bowen, 861 F.2d 533 (8th Cir. 1988), the Eighth Circuit Court of Appeals held:

> [t]he concept of substantial evidence is something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the Secretary may decide to grant or deny benefits without being subject to reversal on appeal.

Id. at 535. See also Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994); Turley v. Sullivan, 939 F.2d 524, 528 (8th Cir. 1991).

It is not the job of the district court to re-weigh the evidence or review the factual record de novo.  McClees v. Shalala, 2 F.3d 301, 302 (8th Cir. 1994); Murphy v. Sullivan, 953 F.2d 383, 384 (8th Cir. 1992).  Instead, the district court must simply determine  whether the quantity and quality of evidence is enough so that a reasonable mind might find it adequate to support the ALJ's conclusion.  Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001) (citing McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)).  Weighing the evidence is a function of the ALJ, who is the fact-finder.  Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987).  See also Onstead v. Sullivan, 962 F.2d 803, 804 (8th Cir. 1992) (holding that an ALJ's decision is conclusive upon a reviewing court if it is supported by "substantial evidence").  Thus, an administrative decision which is supported by substantial evidence is not subject to reversal merely because substantial evidence may also support an opposite conclusion or because the reviewing court would have decided differently.  Krogmeier, 294 F.3d at 1022 (internal citations omitted).  See also Eichelberger,  390 F.3d at 589; Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000) (quoting Terrell v. Apfel, 147 F.3d 659, 661 (8th Cir. 1998)); Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001) (internal citations omitted).

To determine whether the Commissioner's final decision is supported by substantial evidence, the Court is required to review the administrative record as a whole and to consider:

(1) The findings of credibility made by the ALJ;

(2) The education, background, work history, and age of the claimant;

(3) The medical evidence given by the claimant's treating physicians;

(4) The subjective complaints of pain and description of the claimant's physical activity and impairment;

(5) The corroboration by third parties of the claimant's physical impairment;

(6) The testimony of vocational experts based upon proper hypothetical questions which fairly set forth the claimant's physical impairment; and

(7) The testimony of consulting physicians.

Brand v. Sec'y of Dept. of Health, Education and Welfare, 623 F.2d 523, 527 (8th Cir. 1980); Cruse v. Bowen, 867 F.2d 1183, 1184 (8th Cir. 1989).

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months …." 42 U.S.C. § 416(i)(1)(A); 42 U.S.C. § 423(d)(1)(A). The plaintiff has the burden of proving that he has a disabling impairment. 42 U.S.C. § 423(d)(1); Pickner v. Sullivan, 985 F.2d 401, 403 (8th Cir. 1993); Roach v. Sullivan, 758 F. Supp. 1301, 1306 (E.D. Mo. 1991).

"While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced." Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). When evaluating evidence of pain, the ALJ must consider:

> (1) the claimant's daily activities;
>
> (2) the subjective evidence of the duration, frequency, and intensity of the claimant's pain;
>
> (3) any precipitating or aggravating factors;
>
> (4) the dosage, effectiveness, and side effects of any medication; and
>
> (5) the claimant's functional restrictions.

Baker v. Sec'y of Health and Human Servs., 955 F.2d. 552, 555 (8th Cir. 1992); Polaski, 739 F.2d at 1322. The absence of objective medical evidence is just one factor to be considered in evaluating the plaintiff's credibility. Id. The ALJ must also consider the plaintiff's prior work record,

observations by third parties and treating and examining doctors, as well as the plaintiff's appearance and demeanor at the hearing. Id.; Cruse, 867 F.2d at 1186.

The ALJ must make express credibility determinations and set forth the inconsistencies in the record which cause him to reject the plaintiff's complaints. Masterson v. Barnhart, 363 F.3d 731, 738 (8th Cir. 2004); Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 841 (8th Cir. 1992); Ricketts v. Sec'y of Health and Human Servs., 849 F.2d 661, 664 (8th Cir. 1990); Jeffery v. Sec'y of Health and Human Servs., 849 F.2d 1129, 1132 (8th Cir. 1988). It is not enough that the record contains inconsistencies; the ALJ must specifically demonstrate that he considered all of the evidence. Robinson, 956 F.2d at 841; Butler v. Sec'y of Health and Human Servs., 850 F.2d 425, 426 (8th Cir. 1988). The ALJ, however, "need not explicitly discuss each Polaski factor." Strongson v. Barnhart, 361 F.3d 1066, 1072 (8th Cir. 2004). The ALJ need only acknowledge and consider those factors. Id. Although credibility determinations are primarily for the ALJ and not the court, the ALJ's credibility assessment must be based on substantial evidence. Rautio v. Bowen, 862 F.2d 176, 179 (8th Cir. 1988); Millbrook v. Heckler, 780 F.2d 1371, 1374 (8th Cir. 1985).

## VI.
## DISCUSSION

The issue before the Court is whether substantial evidence supports the Commissioner's final determination that Plaintiff was not disabled. Onstead, 962 F.2d at 804. Substantial evidence is that which a reasonable mind might accept as adequate to support the Commissioner's conclusion. Jones v. Chater, 86 F.3d 823, 826 (9th Cir. 1996). The possibility of drawing two inconsistent conclusions from the evidence does not prevent the Commissioner's findings from beings supported by substantial evidence. Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992). Thus, even if there is substantial evidence which would support a decision opposite to that of the Commissioner, the Court must affirm

his decision as long as there is substantial evidence in favor of his position.  Jones, 86 F.3d at 826.

Plaintiff argues that the findings regarding RFC are not supported by substantial evidence because the ALJ did not consider records showing hearing loss in Plaintiff's right ear nor results of a psycho-educational reassessment conducted by St. Louis Public Schools finding Plaintiff's Verbal IQ to be 78 and Plaintiff's Full Scale IQ to be 76.  Plaintiff also contends that the ALJ's determination regarding Plaintiff's RFC is not consistent with the standards set out in Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000) and Lauer v. Apfel, 245 F.3d 700, 703 (8th Cir. 2001).  Plaintiff further alleges that the ALJ did not properly consider Plaintiff's subjective medical complaints pursuant to Polaski. Plaintiff additionally contends that the ALJ improperly relied upon the Medical-Vocational Guidelines to determine that Plaintiff was not disabled.  Upon reviewing the administrative record as a whole, the undersigned finds for the reasons fully set forth below that the decision of the ALJ in the instant cause of action is not supported by substantial evidence and that, therefore, this case should be reversed and remanded to the Commissioner.

The ALJ found that Plaintiff has the RFC to lift and/or carry 10 pounds, both occasionally and frequently; sit, with usual breaks, for about 6 hours in an 8 hour workday; stand and/or walk, with usual breaks, for about 2 hours in an 8-hour workday; and is unlimited in his ability to push and/or pull.  The ALJ further found that Plaintiff has the exertional capacity to perform the full range of sedentary exertional work. [4]

---

[4]      20 C.F.R. § 404.1567(a) defines sedentary work as follows: "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which  involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met."  Indeed,  SSR 85-15, 1985 WL 56857, at *5, states that "[w]here a person has some limitation in climbing and balancing and it is the only limitation, it would not ordinarily have a

The Regulations define RFC as "what [the claimant] can still do" despite his or her "physical or mental limitations." 20 C.F.R. § 404.1545(a). "When determining whether a claimant can engage in substantial employment, an ALJ must consider the combination of the claimant's *mental and physical* impairments." Lauer, 245 F.3d at 703 (emphasis added). "The ALJ must assess a claimant's RFC based on all relevant, credible evidence in the record, 'including the medical records, observations of treating physicians and others, and an individual's own description of his limitation.'" Tucker v. Barnhart, 363 F.3d 781, 783 (8th Cir. 2004) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)). To determine a claimant's RFC, the ALJ must move, analytically, from ascertaining the true extent of the claimant's impairments to determining the kind of work the claimant can still do despite his or her impairments. A "'claimant's residual functional capacity is a medical question.'" Lauer, 245 F.3d at 704 (quoting Singh, 222 F.3d at 451). The Eighth Circuit clarified in Lauer, 245 F.3d at 704, that "'[s]ome medical evidence,' Dykes v. Apfel, 223 F.3d 865, 867 (th Cr. 2000)(per curium), must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's 'ability to function in the workplace,'

---

significant impact on the broad world of work. ... If a person can stoop occasionally (from very little up to one-third of the time) in order to lift objects, the sedentary and light occupational base is virtually intact." The sitting requirement for the full range of sedentary work "allows for normal breaks, including lunch, at two hour intervals." Ellis v. Barnhart, 392 F.3d 988, 996 (8th Cir. 2005) (citing SSR 96-9p, 1996 WL 374185, at *6 (July 2, 1996)). Additionally the range of sedentary jobs requires a claimant "to be able to walk or stand for approximately two hours out of an eight-hour day. The need to alternate between sitting and standing more frequently than every two hours could significantly erode the occupational base for a full range of unskilled sedentary work." Id. at 997 (citing 1996 WL 374185 at *7). Moreover, SSR 96-9p requires that "the RFC assessment should include the frequency with which an applicant needs to alternate between sitting and standing, and if the need exists, that vocational expert testimony may be more appropriate than the grids." Id. It also states that "a finding that an individual has the ability to do less than a full range of sedentary work does not necessarily equate with a decision of disabled."

Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000)." Thus, and ALJ is "required to consider at least some supporting evidence from a professional." Id.

An individual's RFC is "an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or *mental limitations* or restrictions that may affect his or her capacity to do work-related physical and mental activities." SSR 96-8, 1996 WL 374184, at *2 (S.S.A. July 2, 1996) (emphasis added). Additionally, "RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis." Id. Moreover, "[i]t is incorrect to find that an individual has limitations or restrictions beyond those caused by his or her medical impairment(s) including any related symptoms, such as pain." Id.

"RFC is an issue only at steps 4 and 5 of the sequential evaluation process." Id. at *3. The claimant has the burden of persuasion to demonstrate his or her RFC. Stormo v. Barnhardt, 377 f.3d 801, 806 (8th Cir. 2004). At step 4, "RFC must not be expressed initially in terms of the exertional categories of 'sedentary,' 'light,' 'medium,' 'heavy,' and 'very heavy,' work because the first consideration at this step is whether the individual can do past relevant work as he or she actually performed it." Id. "If a claimant establishes [his or] her inability to do past relevant work, then the burden of proof shifts to the Commissioner." Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005) (citing Eichelberger, 390 F.3d at 591). In contrast to the first four steps of the sequential evaluation where the claimant carries the burden of proof, the Commissioner has the burden of production at step 5. Charles v. Barnhart, 375 F.3d 777, 782 n.5 (8th Cir. 2004). At step 5, "[t]he burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner." Goff, 421 F.3d at 790. Also, at step 5, where a

claimant's RFC is expressed in terms of exertional categories, it must be determined whether the claimant can do the full range of work at a given exertional level. The claimant must be able to "perform substantially all of the exertional and nonexertional functions required in work at that level. Therefore, it is necessary to assess the individual's capacity to perform each of these functions in order to decide which exertional level is appropriate and whether the individual is capable of doing the full range of work contemplated by the exertional level." Id.

Upon making an RFC assessment, an ALJ must first identify a claimant's functional limitations or restrictions and then assess his or her work-related abilities on a function-by-function basis. Masterson, 363 F.3d at 737. The Commissioner must show that a claimant who cannot perform his or her past relevant work can perform other work which exists in the national economy. Nevland, 204 F.3d at 857 (citing McCoy v. Schweiker, 683 F.2d 1138, 1146-7 (8th Cir. 1982) (en banc). The Commissioner must first prove that the claimant retains the residual functional capacity to perform other kinds of work. Id. The Commissioner has to prove this by substantial evidence. Warner v. Heckler, 722 F.2d 428, 431(8th Cir. 1983). Second, once the plaintiff's capabilities are established, the Commissioner has the burden of demonstrating that there are jobs available in the national economy that can realistically be performed by someone with the plaintiff's qualifications and capabilities. Nevland, 204 F.3d at 857.

The ALJ in the matter under consideration found that Plaintiff cannot perform his past relevant work. Once a determination is made that a claimant cannot perform past relevant work, the burden shifts to the Commissioner to prove there is work in the economy that the claimant can perform. Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992). To satisfy the Commissioner's burden that there is work in the economy which an individual with a claimant's RFC can perform, the testimony of a vocational expert may be used. An ALJ posing a hypothetical to a vocational expert

is not required to include all of a plaintiff's limitations, but only those which he finds credible. <u>Rautio</u>, 862 F.2d at 180; <u>Roberts v. Heckler</u>, 783 F.2d 110, 112 (8th Cir. 1985). Use of the Medical-Vocational Guidelines is appropriate, however, if the ALJ discredits the claimant's subjective complaints of pain for legally sufficient reasons. <u>Carlock v. Sullivan</u>, 902 F.2d 1341, 1343 (8th Cir. 1990); <u>Hutsell</u>, 892 F.2d at 750. Resort to the Medical-Vocational Guidelines is only appropriate when there are no nonexertional impairments that substantially limit the ability of a claimant to perform substantially gainful activity. <u>Reynolds v. Chater</u>, 82 F.3d 254, 258 (8th Cir. 1996) (holding that when complaints of pain are explicitly discredited by legally sufficient reasons, Guidelines may be used). If the claimant is found to have only exertional impairments, the Commissioner may meet this burden by referring to the Medical Vocational Guidelines. <u>See</u> <u>Robinson</u>, 956 F.2d at 839. If, however, the claimant is also found to have nonexertional impairments that diminish the claimant's capacity to perform the full range of jobs listed in the Guidelines, the Commissioner must solicit testimony from a vocational expert to establish that there are jobs in the national economy that the claimant can perform. <u>See</u> <u>id.</u> SSR 83-10, 1983 WL 31251, at *6, defines a nonexertional impairment as "[a]ny impairment which does not directly affect the ability to sit, stand, walk, lift, carry, push, or pull. This includes impairments which affect the mind, vision, hearing, speech, and use of the body to climb, balance, stoop, kneel, crouch, crawl, reach, handle, and use of the fingers for activities." SSR 83-10, 1983 WL 31251, at *7, defines nonexertional limitation as "[a]n impairment-caused limitation of function which directly affects capability to perform work activities other than the primary strength activities."

Additionally, Listing 12.05C sets forth the requirements of the required severity for a person to be found disabled based on mental retardation. Either that the claimant must depend on others for his or her personal needs, the claimant must have a valid verbal, performance, or full scale IQ of 59

or less, a "valid verbal performance or full scale IQ of 60 through 70 and a physical or other mental impairment imposing additional and significant work-related limitation of function," or a "valid verbal performance, or full scale IQ of 60 through 70 resulting in at least two of the following:" marked restriction of activities of daily living, marked difficulties in maintaining social functioning, concentration, persistence, or pace or repeated episodes of decompensation. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05(C).

Plaintiff in the matter under consideration does not allege that he is disabled based on mental retardation. Indeed, his verbal IQ of 78 and his full scale IQ of 76 are above the level set forth in the Regulations for a finding of disability based on retardation. However, "intellectual capacity is presumed in the [G]uidelines and evidence that militates against [this] presumption[] makes the [G]uidelines inapplicable." Muncy v. Apfel, 247 F.3d 728, 735 (8th Cir. 2001). Moreover, SSR 83-10, 1983 WL 31251, at * 6, defines a nonexertional impairment as "[a]ny impairment which does not directly affect the ability to sit, stand, walk, lift, carry, push, or pull. This includes impairments which affect the mind, vision, hearing, speech, and use of the body to climb, balance, stoop, kneel, crouch, crawl, reach, handle, and use of the fingers for activities." SSR 83-10, 1983 WL 31251, at *7, defines nonexertional limitation as "[a]n impairment-caused limitation of function which directly affects capability to perform work activities other than the primary strength activities." Borderline intellectual functioning "'indicates a significant nonexertional impairment that needs to be considered by [a vocational expert].'" Muncy, 247 F.3d at 735 (quoting Holz v. Apfel, 191 F.3d at 947) (citing Foreman v. Callahan, 122 F.3d 24, 26 (8th Cir.1997); Lucy v. Chater, 113 F.3d 905, 908 (8th Cir.1997)).

In Muncy, 247 F.3d at 734, the Eighth Circuit held that an IQ of 84 indicated borderline intellectual functioning. The IQ of Plaintiff in the matter under consideration was determined to be

below that level. While Plaintiff's IQ scores were determined many years prior to Plaintiff's alleged onset date "a person's IQ is presumed to remain stable over time in the absence of any evidence of a change in a claimant's intellectual functioning." Id. (citing Branham v. Heckler, 775 F.2d 1271, 1274 (4th Cir.1985) (holding that absent contrary evidence, an IQ test taken after the insured period correctly reflects claimant's IQ during the insured period); Guzman v. Bowen, 801 F.2d 273, 275 (7th Cir.1986) (holding that the claimant had low IQ during onset of disability in 1979 rather than just when first IQ tested in 1982); Luckey v. Department of Health & Human Servs., 890 F.2d 666, 668-69 (4th Cir.1989) (holding that an ALJ could assume claimant's IQ remained relatively constant in absence of evidence showing a change in claimant's intelligence functioning); Holmes v. Apfel, 1999 WL 731769, *5 (N.D.Ill.1999) (holding that an IQ score presumptively reflects person's IQ throughout life, no matter how old the person was when test first administered); Ouellette v. Apfel, 2000 WL 1771122, *3 (D. Me.2000) (holding that absent contrary evidence, "a person's IQ and/or the condition of mental retardation is presumed to have been approximately constant throughout his/her life"); Sird v. Chater, 105 F.3d 401, 402 n. 4 (8th Cir.1997)). See also Maresh v. Barnhart, 438 F.3d 897, 900 (8th Cir. 2006).

Also, the court notes that the record in the matter under consideration includes a Disability Report - Field Office, Form SSA-3367, dated May 30, 2003 in which observations were recorded from an in-person interview with Plaintiff. This Disability Report states that Plaintiff had difficulty understanding, concentrating, and answering during the interview. (Tr. 122). The record also includes a Claimant Questionnaire in which Plaintiff stated that he has difficulties in reading and comprehending directions and that he is unable to comprehend what he reads. (Tr. 116, 118).

Because Plaintiff was found in 1986 to have a IQ which is, at most, borderline, because the record does not include results of more recent testing, and because of other records cited above, the

court finds that substantial evidence on the record establishes that Plaintiff has a nonexertional impairment which the ALJ should have considered, but did not, when determining Plaintiff's RFC.

Additionally, the record reflects that Plaintiff has a hearing loss. It was reported in March 2004 that Plaintiff has a profound hearing loss on the right and mild to normal hearing on the left. The ALJ, however, failed to consider what effect, if any, Plaintiff's hearing loss would have on his ability to perform the full range of sedentary work and did not consider Plaintiff's hearing loss when determining his RFC.[5] Because when determining Plaintiff's RFC the ALJ did not consider the extent to which Plaintiff's nonexertional mental and hearing impairments limit his ability to perform the full range of sedentary work, the court finds that substantial evidence on the record does not support the ALJ's finding in regard to Plaintiff's RFC.

Also, while the ALJ found that Plaintiff does have sleep apnea, he did not address whether Plaintiff's sleep apnea affected him in such as way as to limit his ability to engage insubstantial gainful activity. The court notes that the record does reflect that during his May 2003 hospitalization Plaintiff's obstructive sleep apnea was stabilized and Plaintiff was sent home on CPAP. The record does not, however, include the opinion of any medical source in regard to the extent to which Plaintiff's sleep apnea is controlled and/or the effect of Plaintiff's sleep apnea on his ability to work.

In regard to Plaintiff's use of oxygen, the record reflects that Plaintiff and his fiancee said Plaintiff uses oxygen all the time. It was noted by Dr. Haque, however, that Plaintiff's lungs were considered normal and that he had no wheezing or crepitations. Additionally, the record does not include the opinion of any doctor regarding Plaintiff's need for oxygen. Nonetheless, the ALJ did not address what effect, if any, Plaintiff's need for oxygen would have on his ability to engage in

---

[5]        Both the Psycho-Educational Reassessment, which was performed by a psychologist, and the audiological record, were conducted by medical sources. 20 C.F.R. §404.1513(a).

substantial gainful activity. Indeed, to the extent that Plaintiff's need for oxygen and/or his sleep apnea effect his ability to engage in the full range of sedentary work have on his ability to work these symptoms must be considered nonexertional impairments.

For the foregoing reasons the court finds that the decision of the ALJ is not supported by substantial evidence. The court will, therefore, reverse and remand this matter so that the ALJ may render an opinion consistent with this court's findings. Upon remand, the ALJ should fully develop the record in a manner consistent with this opinion.

On remand, the ALJ should obtain the opinion of a medical source to determine whether it is necessary for Plaintiff to use oxygen other than when he is sleeping and, if so, how often and when he must use it. The ALJ should further obtain the opinion of a medical source regarding the extent to which Plaintiff's sleep apnea is controlled and what effect, if any, it would have on his ability to work. Upon remand, if the ALJ chooses, he may have Plaintiff's IQ tested to determine whether it has changed since the 1986 evaluation by the St. Louis Public Schools. Also, upon remand, if the ALJ chooses he may have Plaintiff's hearing tested and consider whether the use of hearing aids improves Plaintiff's ability to hear.[6] The ALJ should make an explicit finding regarding the relevancy of Plaintiff's I.Q., hearing loss, sleep apnea, and need for oxygen, if any, on his ability to work and should include any nonexertional limitations in his determination of Plaintiff's RFC. Upon finding that Plaintiff has nonexertional limitations which affect his ability to work, the ALJ must consult a vocational expert to determine whether there is work which Plaintiff can perform. The ALJ is reminded that once he determines Plaintiff's RFC any hypothetical question which he submits to a

---

[6]     Conditions which can be controlled by treatment are not disabling. Warford v. Bowen, 875 F.2d 671, 673 (8th Cir. 1989) ( holding that a medical condition that can be controlled by treatment is not disabling); James for James v. Bowen, 870 F.2d 448, 450 (8th Cir. 1989).

vocational expert must accurately set forth Plaintiff's impairments and resulting functional limitations so that the vocational expert can realistically assess the availability of jobs.   Brenner v. Schweiker, 711 F.2d 96, 99 (8th Cir. 1983) (citing Camp v. Schweiker, 643 F.2d 1325, 1332-33 (8th Cir.1981)).

Also, upon remand, the ALJ should be mindful that "a finding that an individual has the ability to do less than a full range of sedentary work does not necessarily equate with a decision of disabled." SSR 96-9p, 1996 WL 374185.  **Indeed, the court stresses that by reversing and remanding this matter it does not mean to say that Plaintiff is disabled**.  Because the court is reversing and remanding this matter, the court need not address at this time other reasons why Plaintiff suggests that the ALJ's decision is not based on substantial evidence.

## VII.
## CONCLUSION

The court finds that this matter should be reversed and remanded to the Commissioner of Social Security for further consideration pursuant to 42 U.S.C. 405(g), sentence 4.  Upon remand, th ALJ is directed to fully develop the record in a manner consistent with this court's opinion.  Again, the court stresses that upon reversing and remanding this matter it does not mean to imply that the Commissioner should return a finding of "disabled."   The court is merely concerned that the Commissioner's final determination, as it presently stands, is not supported by substantial evidence on the record as a whole.

**ACCORDINGLY**,

**IT IS HEREBY ORDERED** that the relief which Plaintiff seeks in his Brief in Support of Complaint is **GRANTED**, in part, and **DENIED**, in part. [Doc. 14]

**IT IS FURTHER ORDERED** that a Judgement of Reversal and Remand will issue contemporaneously herewith remanding this case to the Commissioner of Social Security for further consideration pursuant to 42 U.S.C. 405(g), sentence 4.

**IT IS FURTHER ORDERED** that upon entry of the Judgement, the appeal period will begin which determines the thirty (30) day period in which a timely application for attorney's fees under the Equal Access to Justice Act, 28 U.S.C. § 2412, may be filed.

/s/Mary Ann L. Medler
MARY ANN L. MEDLER
UNITED STATES MAGISTRATE JUDGE

Dated this <u>13th</u> day of June, 2006.